**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**1:25 - CV- 00632**

| | | |
|---|---|---|
| Thomas Landers and Susan Juanita Owen-Brooks on behalf of themselves and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Ahold Delhaize USA Services, LLC<br><br>Defendant. | ) | **CLASS ACTION COMPLAINT** |

Plaintiffs Thomas Landers and Susan Juanita Owen-Brooks on behalf of themselves and all others similarly situated, brings this action against Defendant Ahold Delhaize USA Services, LLC ("Ahold Delhaize" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## INTRODUCTION

1. Plaintiffs bring this class action complaint against Ahold Delhaize seeking recompense for its acts and omissions, as alleged below, which led to a breach of Ahold Delhaize's computer systems and network in November 2024, culminating in the theft of Plaintiff's and the Class's sensitive information by cybercriminals (the "Data Breach").

2. Ahold Delhaize USA Services LLC is a subsidiary of Ahold Delhaize USA that provides support services to entities within the Ahold Delhaize USA corporate family, including: Food Lion, Giant Food, The GIANT Company, Hannaford, Stop & Shop, ADUSA Distribution, ADUSA Transportation and others. Ahold Delhaize USA is among the largest food retail and wholesale companies in the United States, operating more than 2,000 across 23 different states.[1]

3. In the regular course of its business, Ahold Delhaize gathers and stores highly personal information obtained from its employees. This includes: (1) personally identifying information ("PII"), like names, addresses, phone numbers, dates of birth, Social Security numbers, passport numbers, driver's license numbers; (2) financial information, including financial account and banking information; (3) protected health information ("PHI") like information related to worker's compensation claims and disability claims; and (4) employment-related details (collectively "Sensitive Information"). On information and belief, Ahold Delhaize gathered the Personal Information of millions of individuals employed by Ahold Delhaize USA's family of companies.

4. Despite understanding the sensitivity of the employee data it stored and that it would be a prime target for hackers, Ahold Delhaize failed to implement adequate systems and procedures for maintaining, safeguarding, and protecting the Sensitive

---

[1] Paul Bischoff, *Food seller Ahold Delhaize notifies 2.2 million people of data breach that compromised SSNs, financial and health info*, Comparitech (June 27, 2025) https://www.comparitech.com/news/food-seller-ahold-delhaize-notifies-2-2-million-people-of-data-breach-that-compromised-ssns-financial-and-health-info/ (last visited July 8, 2025).

Information it gathered. And on or about November 6, 2024, cybercriminals capitalized on these deficiencies, infiltrated Ahold Delhaize 's systems, and extracted the highly sensitive information of over 2.2 million current and former employees of Ahold Delhaize USA's family of companies.[2]

5. Specifically, on November 6, 2024, an unauthorized third party accessed Ahold Delhaize's internal U.S. file repositories and extracted files from its employment records.[3] These files included the Sensitive Information of 2.2 million individuals.[4]

6. The cybercriminals claimed to have extracted 6 Terabytes of data from Ahold Delhaize and have since published some of the information on the dark web.[5]

7. In violation of numerous recommended and required data-security practices, Ahold Delhaize appears to have stored highly sensitive PII, PHI and other Sensitive Information in a single database. Given the sensitive nature of this data, data-security experts admonish that personal, health, and other sensitive data must be segregated from other systems and networks to ensure access remains highly limited and fully monitored. Experts recommend segregating Sensitive Information because this type of personal and sensitive data is highly targeted by hackers who seek to exploit this data for nefarious

---

[2] Marian Zboraj, *Ahold Delhaize Data Breach Affects Over 2 Million People*, Progressive Grocer, (June 30, 2025) https://progressivegrocer.com/ahold-delhaize-data-breach-affects-over-2-million-people (last visited July 8, 2025).
[3] *Id.*
[4] *Id.*
[5] Emily Hill, *Personal Data Stolen in Cyberattack on Food Lion, Hannaford, and More*, The National CIO Review, https://nationalcioreview.com/articles-insights/extra-bytes/personal-data-stolen-in-cyberattack-on-food-lion-hannaford-and-more/ (last visited July 8, 2025).

purposes. Indeed, PII and, in particular, Social Security numbers, have inherent value, and are routinely marketed and sold on the dark web. In the wrong hands, the personal and sensitive data Ahold Delhaize collected, stored, and wrongfully made available to cybercriminals may be utilized to cause significant harm to the those who provided this information, including being used to orchestrate a swath of fraudulent schemes.

8. According to Ahold Delhaize's notice and representations about the Data Breach, the sensitive information stolen in the Data Breach includes a host of highly Sensitive Information, including, but not limited to, names, phone numbers, addresses, emails, dates of birth, Social Security numbers, passport numbers, driver's license numbers, bank account numbers, protected health information such as workers' compensation information, and employment-related information.

9. Illustrating the value of this data, the data stolen in the Data Breach is already reported to be available on the dark web.[6] Indeed, the value of the type of Sensitive Information stolen in the Data Breach is well recognized in the modern data economy, including to cybercriminals on the dark web who use it for fraud and identity theft. As such, the foreseeable risk to individuals as a result of a criminal hacking event is well known and recognized by technology companies and others who gather and store data, including Defendant.

[6] Eduard Kovacs, *Ahold Delhaize Data Breach Impacts 2.2 Million People, SecurityWeek* (June 30, 2025) https://www.securityweek.com/ahold-delhaize-data-breach-impacts-2-2-million-people/ (last visited July 8, 2025).

10. Because Ahold Delhaize collects, stores, and uses Sensitive Information, including Social Security numbers, it gathers from current and former employees of the entities it services, it has a duty to protect it.

11. Despite these requirements and its understanding of the need to implement reasonable security measures to keep current and former employees' information safe, Ahold Delhaize failed to do so.

12. Although the Data Breach occurred in November 2024, Ahold Delhaize did not announce that Sensitive Information had been exfiltrated until five months later April 2025.[7]

13. Ahold Delhaiz could have prevented the Data Breach by properly vetting and monitoring its systems, implementing more robust data privacy measures, and using well-known and well-established data retention and disposal practices, as described further below. Had Ahold Delhaize employed and maintained adequate data-security measures and protocols to secure and protect Plaintiffs' and Class Members' data, Ahold Delhaize would have prevented the Data Breach.

14. Had Plaintiffs and Class Members known Ahold Delhaize maintained inadequate data security protocols, Plaintiffs and Class Members would not have provided their Sensitive Information to members of Ahold Delhaize's corporate family.

15. The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Sensitive Information was a known risk to Defendant, and

---

[7] *See id.*

thus Defendant was on notice that failing to take steps necessary to secure the PII and PHI from those risks made that property vulnerable to being stolen. Despite that, Ahold Delhaize failed to implement reasonable data security and data-retention and disposal practices.

16. Due to Ahold Delhaize's inadequate data security and the resulting Data Breach, Plaintiffs and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

17. Armed with the Sensitive Information accessed in the Data Breach, data thieves can commit a variety of crimes, including opening new financial accounts in Plaintiffs' and Class Members' names, taking out loans in Plaintiffs' and Class Members' names, using Plaintiffs' and Class Members' names to obtain medical services, obtaining driver's licenses in Plaintiffs' and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

18. As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now closely monitor their financial accounts to guard against identity theft for the foreseeable future.

19. The Data Breach has already had serious consequences and will continue to do so. As a direct and proximate result of Ahold Delhaize's inadequate data security and the resulting Data Breach, Plaintiffs and Class Members have suffered, and will continue to suffer, ascertainable losses, economic damages, and other actual injury and harm,

including: (i) from the untimely and inadequate notification of the Data Breach, (ii) the diminished value of their personal information; (iii) the resulting immediate and continuing risk of future ascertainable losses, economic damages and other actual injury and harm, (iv) the opportunity cost and value of lost time they must spend to monitor their financial accounts and other accounts—for which they are entitled to compensation; (v) out-of-pocket expenses for securing identity theft protection and other similar necessary services; and (vi) emotional harm and distress from the exposure of their sensitive records and the prolonged and heightened risk of harm.

20. Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose received or were sent notice that their Sensitive Information was accessed during the Data Breach.

21. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs and for time spent responding to actual or potential fraud and mitigating their risk, and injunctive relief including improvements to Defendant's data-security systems, future annual audits, and adequate credit-monitoring services funded by Defendant.

22. Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct and asserting claims on behalf of the Class as alleged below.

## JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because Plaintiffs are citizens of a state different from Defendant, and because Plaintiffs and the Class seek more than $5,000,000 in damages.

24. This Court has general personal jurisdiction over Ahold Delhaize because Ahold Delhaize USA Services LLC maintains its principal place of business at 2110 Executive Dr., Salisbury, North Carolina, 28147.

25. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Ahold Delhaize resides in this district.

## PARTIES

26. **Plaintiff Thomas Landers** is a citizen of Pennsylvania residing in Pottsville, Pennsylvania. From about October 2006 to October 2016, Landers worked as an Assistant Store Manager for The Giant Company. As an employee of the Giant Company, Landers provided the Giant Company with his Sensitive Information including his name, contact information, Social Security number, date of birth, and bank account information. Landers also entrusted the Giant Company with a substantial amount of his PHI. As an Assistant Store Manager, Landers was eligible for employer-provided health insurance. Landers applied for this insurance through the Giant Company's online employee portal. In 2014, in order to obtain time off to recover back surgery, Landers filed a short-term disability claim with the Giant Company. This required Landers to provide documentation relating to his health condition. On or about July 5, 2025, Landers received a notice from Ahold

Delhaize USA Services LLC notifying him that his personal information was impacted by the data breach.

27. Landers is very careful about sharing his own Sensitive Information and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Landers stores any and all documents containing Sensitive Information in a secure location and destroys any documents he receives in the mail that contain any Sensitive Information or that may contain any information that could otherwise be used to compromise his identity and financial accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts. Since learning of the Data Breach, Landers has spent time monitoring his accounts for fraud and fielding spam phone calls and emails.

28. **Plaintiff Susan Juanita Owen-Brooks** is a North Carolina resident residing in Ahoskie, North Carolina. In April 2021, Owen Brooks worked at a North Carolina Food Lion location in the deli and bakery. As an employee of Food Lion, Owen-Brooks provided Food Lion with her Sensitive Information including her name, contact information, Social Security number, date of birth, and bank account information. During her employment at Food Lion, Owen-Brooks also entrusted Food Lion with her PHI. Specifically, before coming into work one day Owen-Brooks suffered a broken leg as a consequence of her chronic bone disease. She informed her supervisors at Food Lion about her chronic illness and broken leg. On or about June 26, 2025, Landers received a notice from Ahold Delhaize

USA Services LLC notifying him that his Sensitive Information was impacted by the data breach.

29. Owen-Brooks is very careful about sharing her own Sensitive Information and has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source. Owen-Brooks stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or that may contain any information that could otherwise be used to compromise her identity and financial accounts. Moreover, she diligently chooses unique usernames and passwords for her various online accounts. Since learning of the Data Breach, Owen-Brooks has spent time monitoring her accounts for fraud and fielding spam phone calls and emails.

30. Defendant Ahold Delhaize USA Services LLC provides support services to Ahold Delhaize USA companies across twenty different states, including companies that employed Plaintiffs.[8]

---

[8] *Ahold Delhaize USA Services, LLC Provides Update on Cybersecurity Issue*, The National Law Review (June 26, 2025) https://natlawreview.com/press-releases/ahold-delhaize-usa-services-llc-provides-update-cybersecurity-issue#google_vignette (last visited July 8, 2025); Gary Milliefsky, *The Ahold Delhaize USA Breach: How a Single Click Can Cost Millions*, Cyber Defense Magazine, (June 29, 2025) https://www.cyberdefensemagazine.com/the-ahold-delhaize-usa-breach-how-a-single-click-can-cost-millions/ (last visited July 8, 2025).

## FACTUAL ALLEGATIONS

**A. Ahold Delhaize Collected PII and PHI from Employees of the Entities it Serves.**

31. Ahold Delhaize U manages, among other things, Human Resources and payroll for the United States subsidiaries of Ahold Delhaize Inc., including Food Lion, Hannaford, Stop & Shop, The GIANT Company, and others.[9]

32. In order to conduct those services for the Ahold Delhaize USA Inc. subsidiaries, Ahold Delhaize collected a substantial amount of Plaintiffs and putative Class Members' Sensitive Information, including, but not limited to, names, contact information (for example, postal and email addresses and telephone numbers), dates of birth, government-issued identification numbers (for example, Social Security, passport and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information.[10]

33. Ahold Delhaize's parent company, Koninklijke Ahold Delhaize N.V—located in the Netherlands—notes that it is "committed to maintaining the security of [its]

---

[9] Gary Milliefsky, *The Ahold Delhaize USA Breach: How a Single Click Can Cost Millions*, Cyber Defense Magazine, (June 29, 2025) https://www.cyberdefensemagazine.com/the-ahold-delhaize-usa-breach-how-a-single-click-can-cost-millions/ (last visited July 8, 2025).

[10] Ahold Delhaize USA, *Ahold Delhaize USA Services, LLC Provides Update on Cybersecurity Issue* (June 26, 2025) https://www.adusa.com/news-releases/news-release-details/ahold-delhaize-usa-services-llc-provides-update-cybersecurity (last visited July 8, 2025).

systems and data" and recognizes that "good security is critical to the trust of customers, suppliers, *and employees*."[11]

34. Ahold Delhaize outlines its supposed key practices, listing:

- An Information Security Management System (ISMS) covering computer environment systems and data, which is updated as needed to maintain ongoing effectiveness and applicability.
- Internal and external assessments, including audits, vulnerability assessments, and penetration tests, are conducted at least annually.
- The environment is monitored on a 24/7/365 basis by dedicated teams.
- Incident response processes are regularly fine-tuned through exercises and simulations.
- Employees are at least annually educated about information security risks and practices through security awareness trainings.
- Service providers and vendors are required to provide similar education and training to their associates.
- Third parties are assessed for their information security posture prior being granted access to our networks, systems, and/or data.
- Continuous investment in the latest industry standards, including modern technologies for authentication in assets.
- Our local brands are annually audited and certified against the Payment Card Industry Data Security Standard (PCI DSS).[12]

On information and belief, Ahold Delhaize is subject to these same obligations, practices, and policies.

---

[11] Ahold Delhaize, *Security*, https://www.aholddelhaize.com/security/ (last visited July 8, 2025).
[12] *Id.*

35. Ahold Delhaize was aware of the importance of maintaining strong data-security practices, and it recognized the need to protect Plaintiffs' Sensitive Information, both by virtue of its parent company's policies and the widespread data breaches ongoing at similar companies.

36. Ahold Delhaize, however, did not reasonably protect, secure, or store Plaintiff's and the Class's Sensitive Information prior to, during, or after the Data Breach. Rather, it failed to employ reasonable data security measures. Defendant knew or should have known, its security was insufficient to reasonably protect the highly Sensitive Information it maintained.

37. Consequently, cybercriminals circumvented Defendant's security measures, resulting in a significant data breach that impacted millions of individuals.

**B. Ahold Delhaize's Inadequate Data Security Measures Exposed Plaintiffs' and the Class's Sensitive Information during the Data Breach.**

38. On or around November 6, 2024, a malicious actor gained unauthorized access to Ahold Delhaize's internal U.S. business systems.

39. These malicious actors obtained files from Ahold Delahize's internal file repositories, files which contained "different types of personal information such as name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport and driver's license numbers), financial account information (for example, bank account

number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information."[13]

40. Indeed, a cybercriminal ransomware group by the name of INC Ransome have since claimed to have extracted 6 Terabytes of data from Ahold Delhaize's systems and have since published samples of stolen documents on their dark web extortion portal.[14]




*INC Ransom's Dark Web Extortion Portal*

---

[13] Ahold Delhaize USA, *Ahold Delhaize USA Services, LLC Provides Update on Cybersecurity Issue* (June 26, 2025) https://www.adusa.com/news-releases/news-release-details/ahold-delhaize-usa-services-llc-provides-update-cybersecurity (last visited July 8, 2025).

[14] Sergiu Gatlan *Retail giant Ahold Delhaize says data breach affects 2.2 million people*, Bleeping Computer, (June 27, 2025) https://www.bleepingcomputer.com/news/security/retail-giant-ahold-delhaize-says-data-breach-affects-22-million-people/ (last visited July 8, 2025); Emily Hill, *Personal Data Stolen in Cyberattack on Food Lion, Hannaford, and More*, The National CIO Review, https://nationalcioreview.com/articles-insights/extra-bytes/personal-data-stolen-in-cyberattack-on-food-lion-hannaford-and-more/ (last visited July 8, 2025).

41. Despite learning of the breach in November 6, 2024, Ahold Delhaize waited five months until April 2025 to announced that the Sensitive Information of Plaintiffs and Class Members had been compromised.[15]

42. In June 2025, Ahold Delhaize began sending notice to impacted individuals, notifying them of "a cybersecurity issue that may have affected your personal information contained in employment records related to you or your family member." The notice informed individuals that "an unauthorized third party obtained certain files from one of our internal U.S. file repositories" and that "the files that may have been affected contained different types of personal information such as name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information."

43. Notices issued to impacted patients regarding the Data Breach recommended Plaintiffs and the Class take several time-consuming steps to mitigate the risk of future fraud and identity theft, such as signing up for two years of free credit monitoring and

---

[15] Gary Milliefsky, *The Ahold Delhaize USA Breach: How a Single Click Can Cost Millions*, Cyber Defense Magazine, (June 29, 2025) https://www.cyberdefensemagazine.com/the-ahold-delhaize-usa-breach-how-a-single-click-can-cost-millions/ (last visited July 8, 2025).

identity protection services, ordering credit reports, reviewing account statements, and monitoring their credit.

44. Given that Ahold Delhaize purposefully obtained and stored the Sensitive Information of Plaintiffs and the Class and knew or should have known of the serious risk and harm caused by a data breach, Ahold Delhaize was obligated to implement reasonable measures to prevent and detect cyberattacks. This includes measures recommended by the Federal Trade Commission, required by the Health Insurance Portability and Accountability Act, and promoted by data security experts and other agencies. This obligation stems from the foreseeable risk of a Data Breach given that Ahold Delhaize collected, stored, and had access to a swath of highly sensitive patient records and data and, additionally, because other highly publicized data breaches at different healthcare institutions put Ahold Delhaize on notice that the higher personal data it stored might be targeted by cybercriminals.

45. Despite the highly sensitive nature of the information Ahold Delhaize obtained, created, and stored, and the prevalence of health care data breaches, Ahold Delhaize inexplicably failed to take appropriate steps to safeguard the Sensitive Information of Plaintiffs and the Class. The Data Breach itself, and information Defendant has disclosed about the breach to date, including its length, the need to remediate Defendant's cybersecurity, the number of people impacted, and the sensitive nature of the impacted data, collectively demonstrate Defendant failed to implement reasonable measures to prevent the Data Breach.

### C. Ahold Delhaize USA Services LLC Failed to Employ Appropriate Measures to Protect Plaintiff's and Class Members' PII and PHI

46. Defendant breached its obligations to Plaintiffs and Class Members and/or as otherwise negligent and reckless because it failed to establish appropriate security safeguards for all records containing data on individuals and properly maintain and safeguard its computer systems and data.

47. Ahold Delhaize's investigation of the Data Breach revealed the extent to which Ahold Delhaize's data security practices were deficient. The astonishing scope of the data Ahold Delhaize collected and stored collectively in a single database, including decades-old data, represents highly and knowingly unsafe and insecure data-storage and retention practices that would violate even the most basic data-security practices.

48. Given the scope and the means by which it occurred, the Data Breach could only have happened with significant and highly concerning data security deficiencies that Ahold Delhaize knew or should have known created a significant risk of harm to millions of individuals.

49. In all, Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data-security system to reduce the risk of data breaches and cyberattacks
- Failing to meet the standards established by its data-security and privacy policies
- Failing to adequately protect PII and PHI entrusted to it
- Failing to properly monitor its own data security systems for existing intrusions

- Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures
- Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices
- Failing to adhere to industry standards for cybersecurity.

50. Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Sensitive Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Sensitive Information.

51. Accordingly, as outlined below, Plaintiffs and Class Members now face a present and substantially increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendant.

**D. Defendant Failed to Comply with Industry Standards**

52. As shown above, several best practices have been identified that at a minimum should be implemented by entities such as Defendant, including but not limited to: (a) educating all employees; (b) strong passwords; (c) multi-layer security, including firewalls, anti-virus, and anti-malware software; (d) encryption, making data unreadable without a key; (e) multi-factor authentication; (f) backup data; and (g) limiting which employees can access sensitive data.

53. Other cybersecurity practices that are standard include: (a) installing appropriate malware-detection software; (b) monitoring and limiting the network ports; (c) protecting web browsers and email-management systems; (d) setting up network systems such as firewalls, switches and routers; (e) monitoring and protection of physical security

systems; (f) protection against any possible communication system; and (g) training staff regarding critical points.

54. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2); and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

55. These frameworks represent applicable cybersecurity standards in any industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the hacker and causing the Data Breach.

56. Furthermore, Ahold Delhaize is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

57. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[16]

---

[16] Start with Security – A Guide for Business, U.S. Fed. Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

58. The FTC also has provided cybersecurity guidelines for businesses, advising that businesses should protect personal information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[17]

59. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[18]

60. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect personal data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61. Ahold Delhaize failed to properly implement basic data-security practices. Defendant's failure to employ reasonable and appropriate measures to protect against

[17] Protecting Personal Information: A Guide for Business, U.S. Fed. Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[18] *Id.*

unauthorized access to patient PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

## E. Cyberattacks and Data Breaches Cause Disruption and Put Individuals at a Present and Substantially Increased Risk of Fraud and Identity Theft

62. Cyberattacks and data breaches at entities like Defendant can negatively impact the overall daily lives of individuals affected by the breach.

63. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[19]

64. These documented effects are because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII and PHI is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims and take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering"

[19] See GAO-07-737, PII: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, U.S. Gov. Accounting Office, (2007), https://www.gao.gov/new.items/d07737.pdf.

to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

65. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

66. Identity thieves use stolen Sensitive Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

67. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical

---

[20] *See IdentityTheft.gov*, Fed. Trade Comm'n, https://www.identitytheft.gov/#/Steps (last visited Nov. 3, 2023).

services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. Theft of PII and PHI is gravely serious.

68. Sensitive Information, including PII, PHI, and financial information (i.e. bank data) are extremely valuable property rights.[21]

69. The value of Sensitive Information as a commodity is measurable.[22] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."52 American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[23]

70. Consumers place a high value on their PII and a greater value on their PHI, n addition to the privacy of their Sensitive Information. Research shows how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm

---

[21] See, e.g., John T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted); see Marc van Lieshout, The Value of Personal Data, 457 INT'L FED'N FOR INFO. PROCESSING (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[22] See Robert Lowes, Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market, Medscape.com (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192

[23] U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017, IAB Data Center of Excellence (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US $30.49–44.62."[24]

71. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[25] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[26]

72. Cyber criminals seek out PHI at greater rates than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found that there were 956 medical data breaches in 2022 with over 59 million patient records exposed.[27] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[28]

73. According to a report released by the Federal Bureau of Investigation's (FBI) Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[29]

---

[24] See Il-Horn Hann et al., The Value of Online Information Privacy (Oct. 2002) http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf; see also Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, 22 (2) Information Systems Research 254, 254 (June 2011).

[25] See Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019),https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("What Happens to Stolen Healthcare Data") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[26] *Id.*

[27] *See* PROTENUS, 2023 Breach Barometer, PROTENUS.COM, https://www.protenus.com/breach-barometer-report (last visited Oct. 14, 2023).

[28] *Id.*

[29] See Andrew Steager, What Happens to Stolen Healthcare Data, HEALTHTECH MAGAZINE (Oct. 20, 2019),https://healthtechmagazine.net/article/2019/10/what-

74. The value of Sensitive Information is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber theft include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII and PHI have considerable market value.

75. Given the type of targeted attack in this case, the type of Sensitive Information taken, and the modus operandi of cybercriminals in general, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Sensitive Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

76. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[30] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the

---

happens-stolen-healthcare-data-perfcon ("What Happens to Stolen Healthcare Data") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[30] Louis DeNicola, What Is the Dark Web?, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3 lt5wz5ypk4sxyjstad.onion.[31]

77. This prevents dark-web marketplaces from being easily monitored by authorities.

78. Sensitive Information from the Data Breach has already appeared on the dark web.

79. It must also be noted there may be a substantial time lag—measured in years—between when PII and/or financial information is stolen and when it is used (when harm occurs and when it is discovered).

80. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[32]

81. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

---

[31] *Id.*

[32] *See* GAO-07-737, *PII: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Gov. Accounting Office, (2007), https://www.gao.gov/new.items/d07737.pdf at 29.

82. To put a more specific price on the matter, Sensitive Information can sell for as much as $363 per record according to the Infosec Institute.[33]

83. A Social Security number is particularly valuable because criminals can use it to target victims with frauds and scams. Once stolen, fraudulent use of that information and damage to victims may continue for years.

84. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[34] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[35] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

85. Moreover, it is not an easy task to change or cancel a stolen Social Security number.

---

[33] See Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market

[34] Identity Theft and Your Social Security Number, Social Security Administration (2018) at 1, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[35] *Id.* at 4.

86. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

87. PII, as one would expect, commands a very high price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[37]

88. In addition, criminals can use stolen PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[38] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[39]

---

[36] Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[37] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[38] *Id.*
[39] Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable /23015560?seq=1.

89. For this reason, Defendant knew or should have known about these dangers and strengthened its data and email handling systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendant failed to properly prepare for that risk.

**F. Plaintiff's and Class Members' Damages**

90. Having had their sensitive data stolen as a result of the Data Breach, Plaintiffs and the Class are at significant risk of harm, and many have already experienced the rampant and serious misuse of their sensitive information. Indeed, experts advise that anyone potentially affected by the Data Breach should freeze their credit reports to prevent new credit being opened in their name.[40]

91. To date, Defendant has done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach.

92. Although Defendant has offered Plaintiffs and Class Members complimentary fraud and identity monitoring services for up to twenty-four (24) months, that is not enough to repair the damage caused by the Data Breach and to protect the Plaintiffs and Class Members from a lifetime of identity theft.

93. Plaintiffs' Sensitive Information was exfiltrated in the Data Breach and is now in the hands of the cybercriminals who accessed Defendant's computer system.

---

[40] Lorie Konish, *Freezing your credit is the first step to avoid identity theft, expert says. Here's what to know,* CNBA (Aug. 27, 2024) https://www.cnbc.com/2024/08/27/how-to-freeze-your-credit-after-national-public-data-breach.html (last visited July 10, 2025).

94. Plaintiffs' Sensitive Information I was compromised as a direct and proximate result of the Data Breach.

95. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

96. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

97. Plaintiffs and Class Members face the present and substantially increased risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax-return fraud, utility bills opened in their names, credit-card fraud, and similar identity theft.

98. Plaintiffs and Class Members face the present and substantially increased risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Sensitive Information, as potential fraudsters can use that information to target Plaintiffs and Class Members much more effectively.

99. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit-monitoring fees, credit-report fees, credit-freeze fees, and similar costs directly or indirectly related to the Data Breach.

100. Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have

recognized the propriety of loss of value damages in related cases and have awarded loss of value damages.

101. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their medical accounts and sensitive information for misuse.

102. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity-theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

103. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Sensitive Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII and PHI is not accessible online and that access to such data is password protected.

104. Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Sensitive Information—which contain the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

**CLASS ACTION ALLEGATIONS**

105. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

106. Plaintiffs propose the following Nationwide Class definition, subject to amendment as appropriate:

> All persons in the United States whose Sensitive Information was compromised in the Data Breach.

Excluded from the Class are Defendant's officers and directors; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

107. Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

108. **Numerosity:** The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of approximately 2.2 million individuals.

109. **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully maintained, lost, or disclosed Plaintiffs' and Class Members' Sensitive Information;

b. Whether Defendant failed to implement and maintain appropriate data-security safeguards and procedures appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data-security laws and regulations;

d. Whether Defendant's data-security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Plaintiffs and Class Members to safeguard their Sensitive Information;

f. Whether Defendant breached its duty to Plaintiffs and Class Members to safeguard their Sensitive Information;

g. Whether Defendant knew or should have known that its data security-systems and monitoring processes were deficient;

h. Whether Defendant should have discovered the Data Breach sooner;

i. Whether Defendant complied with its own data retention policies;

j. Whether Defendant disseminated, or allowed the dissemination of, Plaintiffs' and Class Members' private or confidential data to unauthorized individuals or entities;

k. Whether Defendant disclosed the Data Breach to Plaintiffs and Class Members in compliance with statute;

l. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

m. Whether Defendant violated the statutes alleged herein;

n. Whether Plaintiffs and Class Members are entitled to damages, civil penalties, treble damages, and/or injunctive relief; and

o. Whether Plaintiffs and Class Members are entitled to recover reasonable attorney fees as provided under the statutes pleaded herein.

110. **<u>Typicality:</u>** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach.

111. **<u>Adequacy of Representation:</u>** Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including class actions resulting from data breaches.

112. **<u>Predominance:</u>** Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

113. **<u>Superiority:</u>** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

114. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CAUSES OF ACTION

## COUNT I

## Negligence

## (on behalf of Plaintiffs and the Class)

115. Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

116. Plaintiffs and Class Members entrusted their Sensitive Information to Defendant on the premise and with the understanding that Defendant would reasonably safeguard their information, use their Sensitive Information for business and permissible purposes only, and not disclose their Sensitive Information to unauthorized third parties.

117. Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, using, and protecting their Sensitive Information from unauthorized third parties.

118. The legal duties owed by Defendant to Plaintiffs and the Class include, but are not limited to:

a. Exercising reasonable care in obtaining, retaining, securing, safeguarding, and deleting the Sensitive Information of Plaintiffs and Class Members in its possession;

b. Protecting Sensitive Information of Plaintiffs and Class Members in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices;

c. Protecting Sensitive Information of Plaintiffs and Class Members in its possession using reasonable and adequate security procedures that are compliant with and carry out the data-security policies of Defendant; and

d. Implementing processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class Members of the Data Breach.

119. Defendant breached its duties to Plaintiffs and Class Members. Defendant knew or should have known the foreseeable risks of collecting and storing Sensitive Information and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

120. Defendant knew or should have known that its security practices did not adequately safeguard the PII and PHI of Plaintiffs and Class Members.

121. Through Defendant's acts and omissions described in this Complaint, including Defendant's failure to provide adequate security and its failure to protect the Sensitive Information of Plaintiffs and Class Members from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Sensitive Information of

Plaintiffs and Class Members during the period it was in Defendant's possession and control.

122. Defendant owed Plaintiffs and the Class a duty based upon the common law duty owed by all to protect others from the foreseeable consequences of their negligent conduct.

123. Defendant's duty to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and Class entrusted Defendant with their confidential Sensitive Information, a necessary part of seeking employment from Defendant's sibling entities.

124. The duty to which Defendant was subject is not connected to any contract between Defendant and Plaintiffs and Class Members.

125. Defendant's misconduct created a foreseeable risk of harm to foreseeable individuals, including Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth in this Complaint. Defendant's misconduct also included its failure to comply with industry standards and its failure to follow its own policies for safekeeping of the Sensitive Information of Plaintiffs and Class Members, such as by implementing basic encryption techniques freely available to Defendant.

126. Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

127. Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII and PHI of Plaintiffs and Class Members.

128. Defendant breached the duties it owed to Plaintiffs and the Class by:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect employees' Sensitive Information;

b. Failing to reasonably dispose of Sensitive Information it no longer had any practical need to retain;

c. Failing to comply with the minimum industry data-security standards during the period of the Data Breach;

d. Failing to act despite knowing or having reason to know that its systems were vulnerable to attack; and

e. Failing to timely and accurately disclose to those affected by the Data Breach that their Sensitive Information had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

129. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the Sensitive Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class.

130. The Sensitive Information of Plaintiffs and the Class was stolen and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding

such Sensitive Information by implementing and maintaining the appropriate security measures.

131. Due to Defendant's conduct, Plaintiffs and Class Members are entitled to credit monitoring. The Sensitive Information taken can be used for identity theft and other types of financial fraud against the members of the Class.

132. Experts recommend that data breach victims obtain credit-monitoring services for at least ten years following a data breach. Annual subscriptions for credit monitoring plans range from approximately $219 to $358 per year. To date, Defendant has only offered twenty four (24) months of complimentary credit-monitoring services.

133. These injuries were reasonably foreseeable given the history of security breaches of this nature.

134. As a direct and proximate result of Defendant's conduct, Plaintiffs' and Class Members' highly sensitive information has been placed on the dark web where cybercriminals have access to it and opportunity to misuse it. Consequently, the confidentiality, integrity, and value of this sensitive information has been diminished because it can no longer guarantee Plaintiffs' and Class Members' identities.

135. Plaintiffs and Class Members were also damaged due to the need to expend time, effort, and money monitoring their financial, health, and insurance accounts, their social media accounts, and their credit scores to identify any misuse of their data. Plaintiffs, in fact, remain at a heightened and substantial risk of harm due to the misuse of their data, which has been placed directly in the hands of criminals. Finally, Plaintiffs suffered

emotional distress stemming from the disclosure of their sensitive data and the heightened and prolonged risk of harm they now suffer.

**COUNT II**

**Negligence *Per se***

**(on behalf of Plaintiffs and the Class)**

136. Plaintiff reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

137. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair ... practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

138. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and the Class's PHI and PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, the foreseeable consequences of a data breach, and Defendant's knowledge that inadequate data security could result in a data breach that imposes "staggering" costs on Plaintiffs and Class Members.

139. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

140. The harm that has occurred and been imposed on Plaintiffs and the Class is the type of harm the FTC Act (and similar state statutes) was intended to guard against.

Indeed, the FTC has pursued over fifty enforcement actions against businesses which, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and the proposed Class.

141. Finally, Defendant's violation of N.C. Gen. Code Stat. § 75-65 constitutes negligence per se. This statute requires businesses operating in North Carolina to provide "notice to the affected person that there has been a security breach following discovery or notification of the breach." Notice must be made "without unreasonable delay."

142. Defendant breached North Carolina's notification requirements by failing to give timely and complete notice. Despite the fact that it knew of the Data Breach in November 2024, Defendant failed to notify the public until April 2025. And as of July 2025, Defendant still had not completed its notice campaign.

143. As a direct and proximate result of Defendant's violations of the FTC Act and North Carolina's data breach statute, Plaintiffs and the Class have been injured and are entitled to damages in an amount to be proven at trial.

144. Plaintiffs seek actual and compensatory damages, injunctive relief, attorneys' fees and expenses, and all other remedies available under the law.

## COUNT III

### Violation of North Carolina's Unfair and Deceptive Trade Practices Act

### (on behalf of Plaintiffs and the Class)

145. Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

146. The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" N.C. Gen. Stat. § 75-1.1(a).

147. Under the act, "commerce" includes "all business activities, however, denominated[.]" *Id.* at § 75-1.1(b).

148. Furthermore, "any person . . . injured . . . by reason of any act or thing done by any other person, firm or corporation in violation of this Chapter, such person . . . so injured shall have a right of action on account of such injury done[.]" *Id.* at § 75-16.

149. Ahold Delhaize USA Services LLC's conduct was unfair and deceptive in violation of the NCUDTPA. Specifically, Ahold Delhaize USA Services LLC acquired the Personal Information of employees of the Ahold Delhaize USA corporate family while omitting its failure to practice reasonable data security measures.

150. Ahold Delhaize USA Services LLC exacerbated the harms caused by its unreasonable data security measures by failing to publicly disclose that cybercriminals had stolen Personal Information during the November 2024 data security incident. Indeed, it was not until April 2025 that Ahold Delhaize USA Services LLC disclosed to the public that personnel files had been stolen and not until June that it began sending notice to impacted individuals.

151. Under N.C. Gen. Stat. §§ 75-61, 75-65, businesses impacted by a data breach must provide notice without reasonable delay.

152. Defendant's conduct was, thus, unethical, unscrupulous, substantially injurious to Plaintiffs and the Class, and against North Carolina's stated policy of quickly providing notice of a data breach.

153. As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class members suffered and continue to suffer injuries and are entitled to damages in an amount to be proven at trial.

154. Plaintiffs seek actual and compensatory damages, injunctive relief, attorneys' fees and expenses, and all other remedies available under the law.

## COUNT IV

### Declaratory Judgment

### (on behalf of Plaintiffs and the Class)

155. Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

156. Pursuant to 28 U.S.C. § 2201(a), this Court has the power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed. Further, this Court has the power to declare either affirmative or negative decrees in form and effect, such as restraining acts that violate the laws described in this Complaint.

157. Whether Defendant's actions caused the Data Breach and subsequent harm to Plaintiffs and the Class, and whether Defendant is presently maintaining adequate data security measure to safeguard Plaintiff's and the Class from further data breaches is an actual controversy.

158. Plaintiffs and the Class are at a substantial and imminent risk of further compromise of their Sensitive Information. This is true irrespective of whether Plaintiffs and the Class are current patients of Defendant because Defendant still maintains a swath of Plaintiff's and the Class's Sensitive Information.

159. Therefore, this Court should enter a judgment declaring the following:

a. Defendant owed a legal duty, at the time of the Data Breach, to Plaintiffs and members of the proposed Class to reasonably protect and secure their Sensitive Information under the common law, FTC Act, 15 U.S.C. § 45(a)(1), and FCRA, 15 U.S.C. § 1681(b);

b. Defendant owed a legal duty, at the time of the Data Breach, to Plaintiffs and members of the proposed Class to provide timely notice of the Data Breach under the common law, FTC Act, 15 U.S.C. § 45(a)(1), and FCRA, 15 U.S.C. § 1681(b);

c. Defendant continues to owe a legal duty to Plaintiffs and members of the proposed Class to reasonably protect and secure their Sensitive Information under the common law, FTC Act, 15 U.S.C. § 45(a)(1), and FCRA, 15 U.S.C. § 1681(b);

d. Defendant continues to owe a legal duty to Plaintiffs and members of the proposed Class to provide timely notice of data breaches under the common law, FTC Act, 15 U.S.C. § 45(a)(1), and FCRA, 15 U.S.C. § 1681(b);

## PRAYER FOR RELIEF

160. WHEREFORE, Plaintiffs respectfully pray for judgment and relief as follows:

a. Certification the Class pursuant to the provisions of Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure and an order that notice be provided to all Class Members;

b. Designation of Plaintiffs as Class representative and the undersigned counsel, Zimmerman Reed LLP, as Class Counsel;

c. An award of damages in an amount to be determined at trial or by this Court;

d. An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e. An award of statutory interest and penalties;

f. An award of costs and attorneys' fees; and

g. Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

161. Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

Dated: July 18, 2025

/s/ E. Winslow Taylor
E. Winslow Taylor, Bar No. 45533
**TAYLOR & TAYLOR ATTORNEYS AT LAW, PLLC**
1080 W. Fourth St.
Winston-Salem, NC 27101
Telephone: (336) 418-7445
winslow@t2legal.com

***Local Civil Rule 83.1(d) Counsel for Plaintiffs***

/s/ Brian C. Gudmundson
Brian C. Gudmundson
(Pending Special Appearance)
Michael J. Laird
(Pending Special Appearance)
Madison M. DeMaris
(Pending Special Appearance)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
madison.demaris@zimmreed.com

***Attorneys for Plaintiffs***